(Slip Opinion) OCTOBER TERM, 2016 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MASLENJAK *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 16–309.　Argued April 26, 2017—Decided June 22, 2017

Petitioner Divna Maslenjak is an ethnic Serb who resided in Bosnia during the 1990's, when a civil war divided the new country. In 1998, she and her family sought refugee status in the United States. Interviewed under oath, Maslenjak explained that the family feared persecution from both sides of the national rift: Muslims would mistreat them because of their ethnicity, and Serbs would abuse them because Maslenjak's husband had evaded service in the Bosnian Serb Army by absconding to Serbia. Persuaded of the Maslenjaks' plight, American officials granted them refugee status. Years later, Maslenjak applied for U. S. citizenship. In the application process, she swore that she had never given false information to a government official while applying for an immigration benefit or lied to an official to gain entry into the United States. She was naturalized as a U. S. citizen. But it soon emerged that her professions of honesty were false: Maslenjak had known all along that her husband spent the war years not secreted in Serbia, but serving as an officer in the Bosnian Serb Army.

The Government charged Maslenjak with knowingly "procur[ing], contrary to law, [her] naturalization," in violation of 18 U. S. C. §1425(a). According to the Government's theory, Maslenjak violated §1425(a) because, in the course of procuring her naturalization, she broke another law: 18 U. S. C. §1015(a), which prohibits knowingly making a false statement under oath in a naturalization proceeding. The District Court instructed the jury that, to secure a conviction under §1425(a), the Government need not prove that Maslenjak's false statements were material to, or influenced, the decision to approve her citizenship application. The Sixth Circuit affirmed the conviction, holding that if Maslenjak made false statements violating

§1015(a) and procured naturalization, then she also violated
§1425(a).

*Held*:

1. The text of §1425(a) makes clear that, to secure a conviction, the
Government must establish that the defendant's illegal act played a
role in her acquisition of citizenship. To "procure . . . naturalization"
means to obtain it. And the adverbial phrase "contrary to law" speci-
fies *how* a person must procure naturalization so as to run afoul of
the statute: illegally. Thus, someone "procure[s], contrary to law,
naturalization" when she obtains citizenship illegally. As ordinary
usage demonstrates, the most natural understanding of that phrase
is that the illegal act must have somehow contributed to the obtain-
ing of citizenship. To get citizenship unlawfully is to get it through
an unlawful means—and that is just to say that an illegality played
some role in its acquisition.

The Government's contrary view—that §1425(a) requires only a vi-
olation in the course of procuring naturalization—falters on the way
language naturally works. Suppose that an applicant for citizenship
fills out the paperwork in a government office with a knife tucked
away in her handbag. She has violated the law against possessing a
weapon in a federal building, and she has done so in the course of
procuring citizenship, but nobody would say she has "procure[d]" her
citizenship "contrary to law." That is because the violation of law and
the acquisition of citizenship in that example are merely coincidental:
The one has no causal relation to the other. Although the Govern-
ment attempts to define such examples out of the statute, that effort
falls short for multiple reasons. Most important, the Government's
attempted carve-out does nothing to alter the linguistic understand-
ing that gives force to the examples the Government would exclude.
Under ordinary rules of language usage, §1425(a) demands a causal
or means-end connection between a legal violation and naturaliza-
tion.

The broader statutory context reinforces the point, because the
Government's reading would create a profound mismatch between
the requirements for naturalization and those for denaturalization:
Some legal violations that do not justify *denying* citizenship would
nonetheless justify *revoking* it later. For example, lies told out of
"embarrassment, fear, or a desire for privacy" (rather than "for the
purpose of obtaining [immigration] benefits") are not generally dis-
qualifying under the statutory requirement of "good moral charac-
ter." *Kungys* v. *United States*, 485 U. S. 759, 780; 8 U. S. C.
§1101(f)(6). But under the Government's reading of §1425(a), any lie
told in the naturalization process would provide a basis for rescinding
citizenship. The Government could thus take away on one day what

it was required to give the day before. And by so unmooring the rev-
ocation of citizenship from its award, the Government opens the door
to a world of disquieting consequences—which this Court would need
far stronger textual support to believe Congress intended. The stat-
ute Congress passed, most naturally read, strips a person of citizen-
ship not when she committed any illegal act during the naturaliza-
tion process, but only when that act played some role in her
naturalization. Pp. 4–9.

    2. When the underlying illegality alleged in a §1425(a) prosecution
is a false statement to government officials, a jury must decide
whether the false statement so altered the naturalization process as
to have influenced an award of citizenship. Because the entire natu-
ralization process is set up to provide little room for subjective pref-
erences or personal whims, that inquiry is properly framed in objec-
tive terms: To decide whether a defendant acquired citizenship by
means of a lie, a jury must evaluate how knowledge of the real facts
would have affected a reasonable government official properly apply-
ing naturalization law.

    If the facts the defendant misrepresented are themselves legally
disqualifying for citizenship, the jury can make quick work of that
inquiry. In such a case, the defendant's lie must have played a role
in her naturalization. But that is not the only time a jury can find
that a defendant's lies had the requisite bearing on a naturalization
decision, because lies can also throw investigators off a trail leading
to disqualifying facts. When relying on such an investigation-based
theory, the Government must make a two-part showing. Initially,
the Government must prove that the misrepresented fact was suffi-
ciently relevant to a naturalization criterion that it would have
prompted reasonable officials, "seeking only evidence concerning citi-
zenship qualifications," to undertake further investigation. *Kungys,*
485 U. S., at 774, n. 9. If that much is true, the inquiry turns to the
prospect that such an investigation would have borne disqualifying
fruit. The Government need not show definitively that its investiga-
tion would have unearthed a disqualifying fact. It need only estab-
lish that the investigation "would predictably have disclosed" some
legal disqualification. *Id.,* at 774. If that is so, the defendant's mis-
representation contributed to the citizenship award in the way
§1425(a) requires. This demanding but still practicable causal
standard reflects the real-world attributes of cases premised on what
an unhindered investigation would have found.

    When the Government can make its two-part showing, the defend-
ant may overcome it by establishing that she was qualified for citi-
zenship (even though she misrepresented facts that suggested the
opposite). Thus, whatever the Government shows with respect to a

thwarted investigation, qualification for citizenship is a complete defense to a prosecution under §1425(a).  Pp. 10–15.

    3. Measured against this analysis, the jury instructions in this case were in error.  The jury needed to find more than an unlawful false statement.  However, it was not asked to—and so did not—make any of the necessary determinations.  The Government's assertion that any instructional error was harmless is left for resolution on remand.  Pp. 15–16.

821 F. 3d 675, vacated and remanded.

    KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined.  GORSUCH, J., filed an opinion concurring in part and concurring in the judgment, in which THOMAS, J., joined.  ALITO, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 16–309

———————

## DIVNA MASLENJAK, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 22, 2017]

JUSTICE KAGAN delivered the opinion of the Court.

A federal statute, 18 U. S. C. §1425(a), makes it a crime to "knowingly procure[], contrary to law, the naturalization of any person." And when someone is convicted under §1425(a) of unlawfully procuring her *own* naturalization, her citizenship is automatically revoked. See 8 U. S. C. §1451(e). In this case, we consider what the Government must prove to obtain such a conviction. We hold that the Government must establish that an illegal act by the defendant played some role in her acquisition of citizenship. When the illegal act is a false statement, that means demonstrating that the defendant lied about facts that would have mattered to an immigration official, because they would have justified denying naturalization or would predictably have led to other facts warranting that result.

## I

Petitioner Divna Maslenjak is an ethnic Serb who resided in Bosnia during the 1990's, when a civil war between Serbs and Muslims divided the new country. In 1998, she and her family (her husband Ratko Maslenjak and their two children) met with an American immigration official

to seek refugee status in the United States. Interviewed under oath, Maslenjak explained that the family feared persecution in Bosnia from both sides of the national rift. Muslims, she said, would mistreat them because of their ethnicity. And Serbs, she testified, would abuse them because her husband had evaded service in the Bosnian Serb Army by absconding to Serbia—where he remained hidden, apart from the family, for some five years. See App. to Pet. for Cert. 58a–60a. Persuaded of the Maslenjaks' plight, American officials granted them refugee status, and they immigrated to the United States in 2000.

Six years later, Maslenjak applied for naturalization. Question 23 on the application form asked whether she had ever given "false or misleading information" to a government official while applying for an immigration benefit; question 24 similarly asked whether she had ever "lied to a[] government official to gain entry or admission into the United States." *Id.,* at 72a. Maslenjak answered "no" to both questions, while swearing under oath that her replies were true. *Id.,* at 72a, 74a. She also swore that all her written answers were true during a subsequent interview with an immigration official. In August 2007, Maslenjak was naturalized as a U. S. citizen.

But Maslenjak's professions of honesty were false: In fact, she had made up much of the story she told to immigration officials when seeking refuge in this country. Her fiction began to unravel at around the same time she applied for citizenship. In 2006, immigration officials confronted Maslenjak's husband Ratko with records showing that he had not fled conscription during the Bosnian civil war; rather, he had served as an officer in the Bosnian Serb Army. And not only that: He had served in a brigade that participated in the Srebrenica massacre—a slaughter of some 8,000 Bosnian Muslim civilians. Within a year, the Government convicted Ratko on charges of making false statements on immigration documents. The

newly naturalized Maslenjak attempted to prevent Ratko's deportation. During proceedings on that matter, Maslenjak admitted she had known all along that Ratko spent the war years not secreted in Serbia but fighting in Bosnia.

As a result, the Government charged Maslenjak with knowingly "procur[ing], contrary to law, [her] naturalization," in violation of 18 U. S. C. §1425(a). According to the Government's theory, Maslenjak violated §1425(a) because, in the course of procuring her naturalization, she broke another law: 18 U. S. C. §1015(a), which prohibits knowingly making a false statement under oath in a naturalization proceeding. The false statements the Government invoked were Maslenjak's answers to questions 23 and 24 on the citizenship application (stating that she had not lied in seeking refugee status) and her corresponding statements in the citizenship interview. Those statements, the Government argued to the District Court, need not have affected the naturalization decision to support a conviction under §1425(a). The court agreed: Over Maslenjak's objection, it instructed the jury that a conviction was proper so long as the Government "prove[d] that one of the defendant's statements was false"—even if the statement was not "material" and "did not influence the decision to approve [her] naturalization." App. to Pet. for Cert. 86a. The jury returned a guilty verdict; and the District Court, based on that finding, stripped Maslenjak of her citizenship. See 8 U. S. C. §1451(e).

The United States Court of Appeals for the Sixth Circuit affirmed the conviction. As relevant here, the Sixth Circuit upheld the District Court's instructions that Maslenjak's false statements need not have influenced the naturalization decision. If, the Court of Appeals held, Maslenjak made false statements violating §1015(a) and she procured naturalization, then she also violated §1425(a)—irrespective of whether the false statements

played any role in her obtaining citizenship. See 821 F. 3d 675, 685–686 (2016). That decision created a conflict in the Circuit Courts.[1] We granted certiorari to resolve it, 580 U. S. ___ (2017), and we now vacate the Sixth Circuit's judgment.

## II
## A

Section 1425(a), the parties agree, makes it a crime to commit some other illegal act in connection with naturalization. But the parties dispute the nature of the required connection. Maslenjak argues that the relationship must be "causal" in kind: A person "procures" her naturalization "contrary to law," she contends, only if a predicate crime in some way "contribut[ed]" to her gaining citizenship. Brief for Petitioner 21. By contrast, the Government proposes a basically chronological link: Section 1425(a), it urges, "punishes the commission of other violations of law *in the course of* procuring naturalization"—even if the illegality could not have had any effect on the naturalization decision. Brief for United States 14 (emphasis added). We conclude that Maslenjak has the better of this argument.

We begin, as usual, with the statutory text. In ordinary usage, "to procure" something is "to get possession of" it. Webster's Third New International Dictionary 1809 (2002); accord, Black's Law Dictionary 1401 (10th ed. 2014) (defining "procure" as "[t]o obtain (something), esp. by special effort or means"). So to "procure . . . naturalization" means to obtain naturalization (or, to use another

_____

[1] Compare 821 F. 3d 675, 685–686 (CA6 2016) (case below), with *United States* v. *Munyenyezi*, 781 F. 3d 532, 536 (CA1 2015) (requiring the Government to make some showing that a misrepresentation mattered to the naturalization decision); *United States* v. *Latchin*, 554 F. 3d 709, 712–715 (CA7 2009) (same); *United States* v. *Alferahin*, 433 F. 3d 1148, 1154–1156 (CA9 2006) (same); *United States* v. *Aladekoba*, 61 Fed. Appx. 27, 28 (CA4 2003) (same).

word, citizenship). The adverbial phrase "contrary to law," wedged in between "procure" and "naturalization," then specifies *how* a person must procure naturalization so as to run afoul of the statute: in contravention of the law—or, in a word, illegally. Putting the pieces together, someone "procure[s], contrary to law, naturalization" when she obtains citizenship illegally.

What, then, does that whole phrase mean? The most natural understanding is that the illegal act must have somehow contributed to the obtaining of citizenship. Consider if someone said to you: "John obtained that painting illegally." You might imagine that he stole it off the walls of a museum. Or that he paid for it with a forged check. Or that he impersonated the true buyer when the auction house delivered it. But in all events, you would imagine illegal acts in some kind of means-end relation—or otherwise said, in some kind of causal relation—to the painting's acquisition. If someone said to you, "John obtained that painting illegally, but his unlawful acts did not play any role in his obtaining it," you would not have a clue what the statement meant. You would think it nonsense—or perhaps the opening of a riddle. That is because if no illegal act contributed at all to getting the painting, then the painting would not have been gotten illegally. And the same goes for naturalization. If whatever illegal conduct occurring within the naturalization process was a causal dead-end—if, so to speak, the ripples from that act could not have reached the decision to award citizenship—then the act cannot support a charge that the applicant obtained naturalization illegally. The conduct, though itself illegal, would not also make the obtaining of citizenship so. To get citizenship unlawfully, we understand, is to get it through an unlawful means— and that is just to say that an illegality played some role

in its acquisition.[2]

The Government's contrary view—that §1425(a) requires only a "violation[] of law in the course of procuring naturalization"—falters on the way language naturally works. Brief for United States 14. Return for a moment to our artwork example. Imagine this time that John made an illegal turn while driving to the auction house to purchase a painting. Would you say that he had "procured the painting illegally" because he happened to violate the

_____

[2] To be fair, the idea of "obtaining citizenship illegally" has one other possible meaning, but no one defends it here because it does not fit with the rest of §1425. On this alternative reading, a person would violate §1425(a) by obtaining citizenship without the requisite legal qualifications—regardless of whether she committed another illegal act in the naturalization process. To vary our earlier example, suppose someone told you that John procured a gun illegally. You might think that meant John got the gun through independently unlawful conduct (*e.g.*, he held up a gun store), as in the case of the painting. But you might instead think that John was just not legally qualified to take possession of a gun—because, for example, he once committed a felony. That alternative interpretation is plausible with respect to goods that not everyone is eligible to obtain, like guns—or like naturalization. And indeed, we have interpreted a civil statute closely resembling §1425(a)—which authorizes denaturalization when, *inter alia*, citizenship is "illegally procured," 8 U. S. C. §1451(a)—to cover that qualifications-based species of illegality. See *Fedorenko* v. *United States*, 449 U. S. 490, 506 (1981). But neither party urges that reading here, and for good reason. Unlike its civil analogue, §1425(a) has a companion provision—§1425(b)—that makes it a crime to "procure or obtain naturalization" for "[one]self or another person not entitled thereto." If obtaining citizenship without legal entitlement were enough to violate §1425(a), then that highly specific language in §1425(b) would be superfluous. Rather than reading those words to do no work, in violation of ordinary canons of statutory construction, we understand Congress to have defined two separate crimes in §1425: Assuming the appropriate *mens rea*, subsection (a) covers illegal means of procurement, as described above, while subsection (b) covers simple lack of qualifications. As we will explain, however, questions relating to citizenship qualifications play a significant role when applying §1425(a)'s causal standard in cases (like this one) predicated on false statements. See *infra*, at 10–11.

law in the course of obtaining it? Not likely. And again, the same is true with respect to naturalization. Suppose that an applicant for citizenship fills out the necessary paperwork in a government office with a knife tucked away in her handbag (but never mentioned or used). She has violated the law—specifically, a statute criminalizing the possession of a weapon in a federal building. See 18 U. S. C. §930. And she has surely done so "in the course of" procuring citizenship. But would you say, using English as you ordinarily would, that she has "procure[d]" her citizenship "contrary to law" (or, as you would really speak, "illegally")? Once again, no. That is because the violation of law and the acquisition of citizenship are in that example merely coincidental: The one has no causal relation to the other.

The Government responds to such examples by seeking to define them out of the statute, but that effort falls short for multiple reasons. According to the Government, the laws to which §1425(a) speaks are only laws "pertaining to naturalization." Brief for United States 20. But to begin with, that claim fails on its own terms. The Government's proposed limitation has no basis in §1425(a)'s text (which refers to "law" generally); it is a *deus ex machina*—rationalized only by calling it "necessary," Tr. of Oral Arg. 39, and serving only to get the Government out of a tight interpretive spot. Indeed, the Government does not really buy its own argument: At another point, it asserts that an applicant for citizenship can violate §1425(a) by bribing a government official, see Brief for United States 16—even though the law against that conduct has nothing in particular to do with naturalization. See 18 U. S. C. §201(b)(1). And still more important, the Government's (sometime) carve-out does nothing to alter the linguistic understanding that gives force to the examples the Government would exclude—and that applies just as well to every application that would remain. Laws pertaining to

naturalization, in other words, are subject to the same rules of language usage as laws concerning other subjects. And under those rules, as we have shown, §1425(a) demands a means-end connection between a legal violation and naturalization. See *supra,* at 5–6. Take §1015(a)'s bar on making false statements in connection with naturalization—the prototypical §1425(a) predicate, and the one at issue here. If such a statement (in an interview, say) has no bearing at all on the decision to award citizenship, then it cannot render that award—as §1425(a) requires—illegally gained.

The broader statutory context reinforces that point, because the Government's reading would create a profound mismatch between the requirements for naturalization on the one hand and those for denaturalization on the other. See *West Virginia Univ. Hospitals, Inc.* v. *Casey*, 499 U. S. 83, 101 (1991) ("[I]t is our role to make sense rather than nonsense out of the *corpus juris*"). The immigration statute requires all applicants for citizenship to have "good moral character," and largely defines that term through a list of unlawful or unethical behaviors. 8 U. S. C. §§1427(a)(3), 1101(f).[3] On the Government's theory, some legal violations that do not justify *denying* citizenship under that definition would nonetheless justify *revoking* it later. Again, false statements under §1015(a) offer an apt illustration. The statute's description of "good moral character" singles out a specific class of lies—"false testimony for the purpose of obtaining [immigration] benefits"—as a reason to deny naturalization. 8 U. S. C. §1101(f)(6). By contrast, "[w]illful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, were not deemed sufficiently culpable to

---

[3] The list of disqualifying conduct is wide-ranging. See, *e.g.,* 8 U. S. C. §1101(f)(4) (illegal gambling); §1101(f)(8) (aggravated felony conviction); §1101(f)(9) (participation in genocide).

brand the applicant as someone who lacks good moral character"—and so are not generally disqualifying. *Kungys* v. *United States*, 485 U. S. 759, 780 (1988) (quoting Supplemental Brief for United States 12). But under the Government's reading of §1425(a), a lie told in the naturalization process—even out of embarrassment, fear, or a desire for privacy—would always provide a basis for rescinding citizenship. The Government could thus take away on one day what it was required to give the day before.

And by so wholly unmooring the revocation of citizenship from its award, the Government opens the door to a world of disquieting consequences—which we would need far stronger textual support to believe Congress intended. Consider the kinds of questions a person seeking citizenship confronts on the standard application form. Says one: "Have you **EVER** been . . . in any way associated with[] any organization, association, fund, foundation, party, club, society, or similar group[?]" Form N–400, Application for Naturalization 12 (2016), online at http://www. uscis.gov/n-400 (as last visited June 20, 2017) (bold in original). Asks another: "Have you **EVER** committed . . . a crime or offense for which you were **NOT** arrested?" *Id.,* at 14. Suppose, for reasons of embarrassment or what-have-you, a person concealed her membership in an online support group or failed to disclose a prior speeding violation. Under the Government's view, a prosecutor could scour her paperwork and bring a §1425(a) charge on that meager basis, even many years after she became a citizen. That would give prosecutors nearly limitless leverage—and afford newly naturalized Americans precious little security. Small wonder that Congress, in enacting §1425(a), did not go so far as the Government claims. The statute it passed, most naturally read, strips a person of citizenship not when she committed any illegal act during the naturalization process, but only when that act played

some role in her naturalization.

### B

That conclusion leaves us with a more operational question: How should §1425(a)'s requirement of causal influence apply in practice, when charges are brought under that law?[4]  Because the proper analysis may vary with the nature of the predicate crime, we confine our discussion of that issue to the kind of underlying illegality alleged here: a false statement made to government officials.  Such conduct can affect a naturalization decision in a single, significant way—by distorting the Government's understanding of the facts when it investigates, and then adjudicates, an application.  So the issue a jury must decide in a case like this one is whether a false statement sufficiently altered those processes as to have influenced an award of citizenship.

The answer to that question, like the naturalization decision itself, turns on objective legal criteria.  Congress

---

[4]JUSTICE GORSUCH would stop before answering that question, see *post*, at 2 (opinion concurring in part and concurring in judgment), but we think that such a halfway-decision would fail to fulfill our responsibility to both parties and courts.  The Government needs to know what prosecutions to bring; defendants need to know what defenses to offer; and district courts need to know how to instruct juries.  Telling them only "§1425(a) has something to do with causation" would not much help them make those decisions.  And we are well-positioned to provide further guidance.  The parties have had every opportunity to address the nature of the statute's causal standard, and both gave us considered views about how the law should work in practice.  See, *e.g.*, Brief for Petitioner 23–24, 30; Brief for United States 17–18, 48; Tr. of Oral Arg. 14–16, 23–25, 39–46.  Moreover, many lower courts have already addressed those same issues—including one that has called this Court's failure to provide clear guidance "maddening[]." *Latchin*, 554 F. 3d, at 713; see, *e.g., id.*, at 713–714; *Munyenyezi*, 781 F. 3d, at 536–538; *Alferahin*, 433 F. 3d, at 1155; *Aladekoba*, 61 Fed. Appx., at 27–28; *United States* v. *Acheampong*, 2015 WL 926113, *2–*3 (D Kan., Mar. 3, 2015); *United States* v. *Odeh*, 2014 WL 5473042, *7–*8 (ED Mich., Oct. 27, 2014).

has prescribed specific eligibility standards for new citizens, respecting such matters as length of residency and "physical[] presen[ce]," understanding of English and American government, and (as previously mentioned) "good moral character," with all its many specific components. See 8 U. S. C. §§1423(a), 1427(a); *supra,* at 8. Government officials are obligated to apply that body of law faithfully—granting naturalization when the applicable criteria are satisfied, and denying it when they are not. See *Kungys*, 485 U. S., at 774, n. 9 (opinion of Scalia, J.); *id.,* at 787 (Stevens, J., concurring in judgment). And to ensure right results are reached, a court can reverse such a determination, at an applicant's request, based on its "own findings of fact and conclusions of law." 8 U. S. C. §1421(c). The entire system, in other words, is set up to provide little or no room for subjective preferences or personal whims. Because that is so, the question of what any individual decisionmaker might have done with accurate information is beside the point: The defendant in a §1425(a) case should neither benefit nor suffer from a wayward official's deviations from legal requirements. Accordingly, the proper causal inquiry under §1425(a) is framed in objective terms: To decide whether a defendant acquired citizenship by means of a lie, a jury must evaluate how knowledge of the real facts would have affected a reasonable government official properly applying naturalization law.

If the facts the defendant misrepresented are themselves disqualifying, the jury can make quick work of that inquiry. In such a case, there is an obvious causal link between the defendant's lie and her procurement of citizenship. To take an example: An applicant for citizenship must be physically present in the United States for more than half of the five-year period preceding her application. See 8 U. S. C. §1427(a)(1). Suppose a defendant misrepresented her travel history to convey she had met that re-

quirement, when in fact she had not. The Government need only expose that lie to establish that she obtained naturalization illegally—for had she told the truth instead, the official would have promptly denied her application. Or consider another, perhaps more common case stemming from the "good moral character" criterion. See §1427(a)(3); *supra,* at 8. That phrase is defined to exclude any person who has been convicted of an aggravated felony. See §1101(f)(8). If a defendant falsely denied such a conviction, she too would have gotten her citizenship by means of a lie—for otherwise the outcome would have been different. In short, when the defendant misrepresents facts that the law deems incompatible with citizenship, her lie must have played a role in her naturalization.

But that is not the only time a jury can find that a defendant's lie had the requisite bearing on a naturalization decision. For even if the true facts lying behind a false statement would not "in and of themselves justify denial of citizenship," they could have "led to the discovery of other facts which would" do so. *Chaunt* v. *United States*, 364 U. S. 350, 352–353 (1960). We previously addressed that possibility when considering the civil statute that authorizes the Government to revoke naturalization. See *Kungys*, 485 U. S., at 774–777 (opinion of Scalia, J.) (interpreting 8 U. S. C. §1451(a)).[5] As we explained in that context, a person whose lies throw investigators off a trail leading to disqualifying facts gets her citizenship by means of those lies—no less than if she had denied the damning facts at the very end of the trail. See *ibid.*

When relying on such an investigation-based theory, the

––––––––––

[5] *Kungys* concerned the part of that statute providing for the revocation of citizenship "procured by concealment of a material fact or by willful misrepresentation." §1451(a). As noted earlier, the same statute includes a prong covering citizenship that is "illegally procured." See n. 2, *supra.*

Government must make a two-part showing to meet its burden. As an initial matter, the Government has to prove that the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials, "seeking only evidence concerning citizenship qualifications," to undertake further investigation. *Id.,* at 774, n. 9. If that much is true, the inquiry turns to the prospect that such an investigation would have borne disqualifying fruit. As to that second link in the causal chain, the Government need not show definitively that its investigation would have unearthed a disqualifying fact (though, of course, it may). Rather, the Government need only establish that the investigation "would predictably have disclosed" some legal disqualification. *Id.,* at 774; see *id.,* at 783 (Brennan, J., concurring). If that is so, the defendant's misrepresentation contributed to the citizenship award in the way we think §1425(a) requires.

That standard reflects two real-world attributes of cases premised on what an unhindered investigation would have found. First is the difficulty of proving that a hypothetical inquiry would have led to some disqualifying discovery, often several years after the defendant told her lies. As witnesses and other evidence disappear, the Government's effort to reconstruct the course of a "could have been" investigation confronts ever-mounting obstacles. See *id.,* at 779 (opinion of Scalia, J.). Second, and critical to our analysis, is that the defendant—not the Government—bears the blame for that evidentiary predicament. After all, the inquiry cannot get this far unless the defendant made an unlawful false statement and, by so doing, obstructed the normal course of an investigation. See *id.,* at 783 (Brennan, J., concurring) (emphasizing that "the citizen's misrepresentation [in a naturalization proceeding] necessarily frustrated the Government's investigative efforts"); see also *Bigelow* v. *RKO Radio Pictures, Inc.,* 327

U. S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created").

Section 1425(a) is best read to take those exigencies and equities into account, by enabling the Government (as just described) to rest on disqualifications that a thwarted investigation predictably would have uncovered. A yet-stricter causal requirement, demanding proof positive that a disqualifying fact would have been found, sets the bar so high that "we cannot conceive that Congress intended" that result. *Kungys*, 485 U. S., at 777 (opinion of Scalia, J.). And nothing in the statutory text requires that approach. While §1425(a) clearly imports some kind of causal or means-end relation, see *supra,* at 5–9, Congress left that relation's precise character unspecified. Cf. *Burrage* v. *United States*, 571 U. S. ___, ___ (2014) (slip op., at 10) (noting that courts have not always construed criminal statutes to "require[] strict but-for causality," and have greater reason to reject such a reading when the laws do not use language like "results from" or "because of"). The open-endedness of the statutory language allows, indeed supports, our adoption of a demanding but still practicable causal standard.

Even when the Government can make its two-part showing, however, the defendant may be able to overcome it. Section 1425(a) is not a tool for denaturalizing people who, the available evidence indicates, were actually qualified for the citizenship they obtained. When addressing the civil denaturalization statute, this Court insisted on a similar point: We provided the defendant with an opportunity to rebut the Government's case "by showing, through a preponderance of the evidence, that the statutory requirement as to which [a lie] had a natural tendency to produce a favorable decision was in fact met." *Kungys*, 485 U. S., at 777 (opinion of Scalia, J.) (emphasis deleted);

accord, *id.,* at 783–784 (Brennan, J., concurring). Or said otherwise, we gave the defendant a chance to establish that she was qualified for citizenship, and held that she could not be denaturalized if she did so—even though she concealed or misrepresented facts that suggested the opposite. And indeed, all our denaturalization decisions share this crucial feature: We have never read a statute to strip citizenship from someone who met the legal criteria for acquiring it. See, *e.g., Fedorenko* v. *United States*, 449 U. S. 490, 505–507 (1981); *Costello* v. *United States*, 365 U. S. 265, 269–272 (1961); *Schneiderman* v. *United States*, 320 U. S. 118, 122–123 (1943). We will not start now. Whatever the Government shows with respect to a thwarted investigation, qualification for citizenship is a complete defense to a prosecution brought under §1425(a).

## III

Measured against all we have said, the jury instructions in this case were in error. As earlier noted, the District Court told the jury that it could convict based on any false statement in the naturalization process (*i.e.,* any violation of §1015(a)), no matter how inconsequential to the ultimate decision. See App. to Pet. for Cert. 86a; *supra,* at 3. But as we have shown, the jury needed to find more than an unlawful false statement. Recall that Maslenjak's lie in the naturalization process concerned her prior statements to immigration officials: She swore that she had been honest when applying for admission as a refugee, but in fact she had not. See *supra,* at 2–3. The jury could have convicted if that earlier dishonesty (*i.e.*, the thing she misrepresented when seeking citizenship) were itself a reason to deny naturalization—say, because it counted as "false testimony for the purpose of obtaining [immigration] benefits" and thus demonstrated bad moral character. See *supra,* at 11–12. Or else, the jury could have convicted if (1) knowledge of that prior dishonesty would have led a

reasonable official to make some further investigation (say, into the circumstances of her admission), (2) that inquiry would predictably have yielded a legal basis for rejecting her citizenship application, and (3) Maslenjak failed to show that (notwithstanding such an objective likelihood) she was in fact qualified to become a U. S. citizen. See *supra,* at 12–15. This jury, however, was not asked to—and so did not—make any of those determinations. Accordingly, Maslenjak was not convicted by a properly instructed jury of "procur[ing], contrary to law, [her] naturalization."

The Government asserts that any instructional error in this case was harmless. "Had officials known the truth," the Government asserts, "it would have affected their decision to grant [Maslenjak] citizenship." Brief for United States 12. Unsurprisingly, Maslenjak disagrees. See Tr. of Oral Arg. 6–8; Reply to Brief in Opposition 9–10. In keeping with our usual practice, we leave that dispute for resolution on remand. See, *e.g., Skilling* v. *United States*, 561 U. S. 358, 414 (2010).

For the reasons stated, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

No. 16–309

---

## DIVNA MASLENJAK, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 22, 2017]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring in part and concurring in the judgment.

The Court holds that the plain text and structure of the statute before us require the Government to prove causation as an element of conviction: The defendant's illegal conduct must, in some manner, cause her naturalization. I agree with this much and concur in Part II–A of the Court's opinion to the extent it so holds. And because the jury wasn't instructed at all about causation, I agree too that reversal is required.

But, respectfully, there I would stop. In an effort to "operational[ize]" the statute's causation requirement, the Court says a great deal more, offering, for example, two newly announced tests, the second with two more sub-parts, and a new affirmative defense—all while indicating that some of these new tests and defenses may apply only in some but not all cases. See, *e.g., ante,* at 10–15. The work here is surely thoughtful and may prove entirely sound. But the question presented and the briefing before us focused primarily on whether the statute contains a *materiality* element, not on the contours of a *causation* requirement. So the parties have not had the chance to join issue fully on the matters now decided. Compare *ante,* at 10, n. 4, with Brief for Petitioner, pp. i, 18–38; Brief for United States, pp. i, 12–51. And, of course, the

lower courts have not had a chance to pass on any of these
questions in the first instance. Most cited by the Court
have (again) focused only on the materiality (not causa-
tion) question; none has tested the elaborate operational
details advanced today; and at least one has found our
prior unilateral and fractured foray into a related statute
in *Kungys* v. *United States*, 485 U. S. 759 (1988), "madden-
ing[]." See *ante*, at 10, n. 4 (collecting cases).

Respectfully, it seems to me at least reasonably possible
that the crucible of adversarial testing on which we usually
depend, along with the experience of our thoughtful col-
leagues on the district and circuit benches, could yield
insights (or reveal pitfalls) we cannot muster guided only
by our own lights. So while I agree with the Court that
the parties will need guidance about the details of the
statute's causation requirement, see *ibid.*, I have no doubt
that the Court of Appeals, with aid of briefing from the
parties, can supply that on remand. Other circuits may
improve that guidance over time too. And eventually we
can bless the best of it. For my part, I believe it is work
enough for the day to recognize that the statute requires
some proof of causation, that the jury instructions here did
not, and to allow the parties and courts of appeals to take
it from there as they usually do. This Court often speaks
most wisely when it speaks last.

# SUPREME COURT OF THE UNITED STATES

_____

## No. 16–309

_____

## DIVNA MASLENJAK, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 22, 2017]

JUSTICE ALITO, concurring in the judgment.

We granted review in this case to decide whether "a naturalized American citizen can be stripped of her citizenship in a criminal proceeding based on an immaterial false statement." Pet. for Cert. i. The answer to that question is "no." Although the relevant criminal statute, 18 U. S. C. §1425(a), does not expressly refer to the concept of materiality, the critical statutory language effectively requires proof of materiality in a case involving false statements. The statute makes it a crime for a person to "procure" naturalization "contrary to law." In false statement cases, then, the statute essentially imposes the familiar materiality requirement that applies in other contexts. That is, a person violates the statute by procuring naturalization through an illegal false statement which has a "natural tendency to influence" the outcome—that is, the obtaining of naturalization. *Kungys* v. *United States*, 485 U. S. 759, 772 (1988).

Understood in this way, Section 1425(a) does not require proof that a false statement actually had some effect on the naturalization decision. The operative statutory language—"procure" naturalization "contrary to law"—imposes no such requirement.

Here is an example. Eight co-workers jointly buy two season tickets to see their favorite football team play.

They all write their names on a piece of paper and place the slips in a hat to see who will get the tickets for the big game with their team's traditional rival. One of the friends puts his name in twice, and his name is drawn. I would say that he "procured" the tickets "contrary to" the rules of the drawing even though he might have won if he had put his name in only once.

Here is another example. A runner who holds the world's record in an event wants to make sure she wins the gold medal at the Olympics, so she takes a performance enhancing drug. She wins the race but fails a drug test and is disqualified. The second-place time is slow, and sportswriters speculate that she would have won without taking the drug. But it would be entirely consistent with standard English usage for the race officials to say that she "procured" her first-place finish "contrary to" the governing rules.

As these examples illustrate—and others could be added— the language of 18 U. S. C. §1425(a) does not require that an illegal false statement have a demonstrable effect on the naturalization decision. Instead, the statute applies when a person makes an illegal false statement to obtain naturalization, and that false statement is material to the outcome. I see no indication that Congress meant to require more.

One additional point is worth mentioning. Section 1425(a) not only makes it a crime to procure naturalization contrary to law; it applies equally to any person who "attempts to procure, contrary to law . . . . naturalization." Therefore, if a defendant knowingly performs a substantial act that he or she thinks will procure naturalization, that is sufficient for conviction. See *United States* v. *Resendiz-Ponce*, 549 U. S. 102, 106–108 (2007).