# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-2617
_____

United States of America

*Plaintiff - Appellee*

v.

Deanah Chelagat Cheboss

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: April 13, 2023
Filed: August 11, 2023
_____

Before LOKEN, SHEPHERD, and KELLY, Circuit Judges.
_____

LOKEN, Circuit Judge.

Deanah Chelagat Cheboss appeals her conviction for having knowingly procured her naturalization contrary to law in violation of 18 U.S.C. § 1425(a). Ms. Cheboss made several false statements in procuring her naturalization. The issues on appeal are whether the government met its burden to prove beyond a reasonable doubt that the false statements were *material*, as that element of the § 1425(a) offense was defined in <u>Maslenjak v. United States</u>, 582 U.S. 335 (2017), and whether they were

made "under oath," see 18 U.S.C. § 1015(a). We review these issues *de novo*, viewing the evidence in the light most favorable to the government and affirming if a reasonable finder of fact could find the conviction supported beyond a reasonable doubt. See United States v. Coleman, 584 F.3d 1121, 1125 (8th Cir. 2009) (standard of review); United States v. Santos, 947 F.3d 711, 730 n.12 (11th Cir. 2020). Applying this deferential standard, we affirm.

## I. Background

This prosecution has a complex history. We limit our review to facts and procedural history relevant to the issues on appeal. In August 1999, Kenyan-born Gideon Tanui entered the United States on a tourist visa. He overstayed the visa, leaving the United States in 2001. That made him ineligible for admission into the United States for ten years. See 8 U.S.C. § 1182(a)(9)(B)(i)(II). The government denied Gideon a second tourist visa in 2004. In September 2005, his Kenyan wife, Deanah Kipyego, now Deanah Cheboss,[1] entered the United States on a diversity visa as a lawful permanent resident. The diversity visa application, signed in May 2004, listed Gideon Tanui as Deanah's husband. Immigration records reflect that, in an April 2005 visa interview in Kenya, she falsely claimed Gideon Tanui passed away.[2]

In October 2008, Gideon Tanui, now in Kenya, used the false alias "Gideon Cheboss" to obtain a G2 visa, a nonimmigrant visa for government representatives,

---

[1]Because the change in her surname is an important aspect of this prosecution, we are referring to her as "Deanah" to avoid confusion.

[2]Deanah argues no interview took place. But she signed the diversity visa application where applicants are instructed to sign during interviews, and a Department of State "Immigrant Data Summary" prepared after the interview listed her marital status as widowed. A government witness testified at trial that Gideon's Department of Homeland Security immigration file contains a Department of State document affirming that Deanah said Gideon Tanui died.

falsely stating he would represent Kenya at the 63rd session of the United Nations General Assembly. The G2 visa authorized Gideon to stay in the United States until the end of the U.N. session in September 2009. Instead, Gideon entered the United States and never left. In June 2009, Deanah filed a Form I-130 Petition for Alien Relative on behalf of "Gideon Cheboss," her new husband. The Petition falsely stated that Deanah was married to Gideon Tanui until April 2005 and married Gideon Cheboss in October 2008. She attached a Kenyan document certifying her marriage to Gideon Cheboss and a false Kenyan death certificate for Gideon Tanui. The Petition was approved on August 11, 2010.

On July 21, 2010, Deanah signed a Form N-400 Application for Naturalization. Above her signature, Deanah "certif[ied], under penalty of perjury under the laws of the United States of America, that this application, and the evidence submitted with it, are all true and correct." The Application repeated the false statement that Deanah had married twice, provided the date of the "new" marriage, and attached Gideon Tanui's false death certificate. Deanah answered "No" to Question 23: "Have you ever given false or misleading information to any U.S. Government official while applying for any immigration benefit . . . ?"

Department of Homeland Security regulations provide that, "[s]ubsequent to the filing of an application for naturalization, each applicant shall appear in person before a [United States Citizenship and Immigration Services] officer designated to conduct examinations" for an examination which "shall be uniform throughout the United States and shall encompass all factors relating to the applicant's eligibility for naturalization." 8 C.F.R. § 335.2(a). Deanah's Application recites that USCIS Officer D. Howe interviewed her on December 20, 2010 in Des Moines, Iowa. Deanah again signed the N-400 under penalty of perjury, reaffirming her previous answers, the basis for this prosecution. The N-400 form contains red marks next to answers that she was married twice, the date of her "new" marriage to Gideon, and that she had never given false or misleading information to a governmental official

-3-

while applying for an immigration benefit. In addition, red handwriting states that Deanah's marriage to Gideon Tanui ended in May 2005. It is undisputed these statements were false. The regulations provide that an applicant is questioned "under oath or affirmation," and the officer "shall correct written answers . . . to conform to the oral statements made under oath or affirmation." 8 C.F.R. § 335.2(c). At trial, Carrie Harmsen, a USCIS supervisory officer who has conducted thousands of naturalization interviews, testified it is USCIS practice to use red check marks or slashes to indicate answers the applicant orally confirmed at the interview, and that information in red handwriting means the applicant provided it at the interview.

The N-400 Application was approved and Deanah became a United States citizen in January 2011. Now the spouse of an American citizen, Gideon Cheboss could immediately apply for permanent residency, avoiding what is often long delays. See 8 U.S.C. § 1255(a). He applied in February 2011 and became a permanent resident in July 2011.

John Haase, special agent with Homeland Security Investigations, received a referral from the USCIS fraud detection unit regarding Deanah and Gideon. Haase uncovered the true immigration story after interviewing Gideon and matching fingerprint records between Gideon Cheboss and Gideon Tanui. A federal grand jury indicted Deanah for unlawful procurement of naturalization in violation of 18 U.S.C. § 1425(a) and Gideon for various violations of the immigration laws. Gideon pleaded guilty to attempted naturalization fraud prior to trial.

The government and Deanah proceeded to a one-day bench trial. The government first called Gideon, who invoked his privilege not to testify against his wife. The government then submitted the above-summarized immigration documents. Special Agent Haase and Carrie Harmsen testified for the government. Immigration lawyer Laura Lichter testified as a defense expert that in about one of 15 naturalization interviews, the interviewer fails to place the applicant under oath.

After closing arguments, the district court[3] noted that the government "can establish somebody's guilt beyond a reasonable doubt through circumstantial evidence" and found that the government "has established with proof beyond a reasonable doubt that Ms. Cheboss did commit the crime of which she's charged." The court subsequently sentenced Deanah to three years supervised release and granted the government's motion to revoke her citizenship. See 8 U.S.C. § 1451(e).

## II. Discussion

A conviction under 18 U.S.C. § 1425(a) requires the government to prove that Deanah "knowingly procure[d] . . . contrary to law, the naturalization of any person." 18 U.S.C. § 1425(a). It is "contrary to law" if a person "knowingly makes any false statement under oath, in any . . . matter relating to . . . naturalization, citizenship, or registry of aliens." 18 U.S.C. § 1015(a). However, in Maslenjak, resolving a conflict in the circuits, the Supreme Court held that, to support a conviction under 18 U.S.C. § 1425(a), a knowingly false statement that violates § 1015(a) must be "material," that is, the government must prove "the defendant lied about facts that would have mattered to an immigration official." 582 U.S. at 338. The false statements must have "somehow contributed to the obtaining of citizenship." Id. at 342. On appeal, Deanah argues the government failed to prove beyond a reasonable doubt that (i) she made a material false statement under oath during her naturalization application, and (ii) she did not qualify for naturalization, a complete defense to a § 1425(a) charge.

**A. Material False Statement.** In Maslenjak, after concluding that § 1425(a) requires proof of a causal connection -- that a material false statement "played some role" in procuring naturalization -- the Supreme Court addressed how this requirement would apply. If the facts the defendant misrepresented would themselves

---

[3]The Honorable Stephanie M. Rose, Chief Judge of the United States District Court for the Southern District of Iowa.

disqualify the applicant for naturalization, such as falsely representing physical presence in the United States for the period required in 8 U.S.C. § 1427(a)(1), "there is an obvious causal link between the defendant's lie and her procurement of citizenship." 582 U.S. at 348. But even where the true facts are not themselves disqualifying, the Court explained, the government can prove the requisite causal link by relying on an "investigation-based theory," which requires proof that (i) the misrepresented fact was sufficiently relevant to a naturalization criterion that it would have prompted reasonable officials to undertake further investigation, and (ii) "that the investigation would predictably have disclosed some legal disqualification." Id. at 349-50 (quotation omitted).

To be eligible for naturalization, an applicant must show that she "has been and still is a person of good moral character" for the five years prior to applying for naturalization up to the time of admission. 8 U.S.C. § 1427(a)(3). One of eight statutorily enumerated conditions that preclude a person from being found to be of good moral character is giving "false testimony for the purpose of obtaining" an immigration benefit. 8 U.S.C. § 1101(f)(6); see 8 C.F.R. § 316.10(b)(2)(vi); Amador-Palomares v. Ashcroft, 382 F.3d 864, 867 (8th Cir. 2004).[4] In this case, relying on the "investigation-based theory" articulated by the Supreme Court in Maslenjak, the government argued the false statements in Deanah's N-400 Application for Naturalization were material because, had the true facts been disclosed, immigration officers would have undertaken further investigation and learned the false statements were given for the purpose of obtaining an immigration

---

[4]Section 1101(f)(6) is limited to false testimony for the purpose of obtaining immigration benefits. "Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy" are insufficient. Kungys v. United States, 485 U.S. 759, 780 (1988).

benefit for Gideon in violation of § 1101(f)(6),[5] and denied naturalization under § 1427(a)(3) because Deanah was not a person of good moral character.

At trial, Carrie Harmsen testified that questions relating to good moral character are thoroughly investigated; had they known of Deanah's false statements, USCIS would have investigated and denied naturalization for lack of good moral character under § 1101(f)(6). This testimony, combined with the highly suspicious timing of Gideon's G2 visa expiration, Deanah's Form I-130 Petition and Application for Naturalization, and Gideon's immediate petition for permanent residency when Deanah was granted citizenship, are sufficient to meet the government's burden regarding the likelihood and outcome of a further investigation. See Santos, 947 F.3d at 733-34; United States v. Haroon, 874 F.3d 479, 483-84 (6th Cir. 2017).

Deanah argues she never lied to obtain immigration benefits. She cites testimony by defense expert Lichter that Gideon did not in fact overstay his G2 "duration of status" visa[6] and could have applied for an immigration waiver to permit a permanent residency adjustment. Therefore, Deanah becoming a citizen was not a benefit to Gideon.

---

[5]Gideon, a person in the United States who had overstayed his nonimmigrant G2 visa, could not adjust to permanent resident status within the United States. See 8 U.S.C. § 1255(c)(2). This bar would not apply if Deanah became a United States citizen. In addition, with Deanah a citizen, Gideon could avoid the months or years applicants normally wait to obtain a visa to become a permanent resident. § 1255(a). The regulations make clear that one who gives false testimony to obtain immigration benefits for another lacks good moral character. See 8 C.F.R. § 316.10(b)(2)(vi). Deanah does not argue otherwise.

[6]See generally Guilford Coll. v. Wolf, No. 1:18CV891, 2020 WL 586672, at *1 (M.D.N.C. Feb. 6, 2020).

Whether Deanah acted with the requisite intent is a question of fact. <u>Kungys</u>, 485 U.S. at 782. We conclude a reasonable factfinder could find she acted to obtain immigration benefits for her spouse. Deanah began her lies after Gideon's second tourist visa was denied. She repeated the false statements in subsequent immigration documents. Gideon applied for permanent residency a month after Deanah became a citizen, taking full and immediate advantage of the benefits she obtained. It is hard to imagine any purpose of the falsehoods *except* to benefit Gideon, even if merely to protect Gideon's unlawful presence in the United States. <u>Cf.</u> <u>Liwanag v. I.N.S.</u>, 872 F.2d 685, 689 (5th Cir. 1989). Moreover, Deanah's false answer to Question 23 -- that she had never given false or misleading information to a government official -- was for the purpose of obtaining an immigration benefit for herself; a truthful answer would have showed she lacked good moral character and therefore was ineligible for naturalization. "There can be no doubt that one who falsely denies during a naturalization interview that she has previously given false or misleading information to a government official does so for the purpose of obtaining naturalization benefits." <u>Yemer v. USCIS</u>, 359 F. Supp. 3d 423, 431 (E.D. Va. 2019).

Deanah argues the false statements were immaterial because they did not necessarily establish she lacked good moral character. We disagree. 8 U.S.C. § 1101(f) provides that "[n]o person shall be regarded as, or found to be, a person of good moral character who" gives false testimony to obtain an immigration benefit in violation of § 1101(f)(6). <u>See</u> 8 C.F.R. § 316.10(b)(2)(vi); <u>Reynoso v. Holder</u>, 711 F.3d 199, 210-11 (1st Cir. 2013).

**B. Under Oath.** 8 U.S.C. § 1101(f)(6) provides that no person "who has given false testimony for the purpose of obtaining any [immigration] benefit" may be regarded as having good moral character. Deanah argues that "false testimony" is limited to false statements given *verbally* under oath. As the government failed to prove beyond a reasonable doubt that the false statements in her N-400 Application

for Naturalization were given *orally* and *under oath*, the government failed to present sufficient evidence and we "need not even address materiality." We disagree.

Deanah argues the government failed to prove the answers she provided at the naturalization interview were made "under oath" because (i) the Form N-400 does not say so; (ii) USCIS interviewing officer Howe did not testify; (iii) USCIS supervisory officer Harmsen had no first hand knowledge and could only testify as to how officers should conduct the interviews; and (iv) defense expert Lichter testified that based on her experience interviewers frequently do not put naturalization applicants under oath. In addition, Deanah argues, Harmsen's testimony that the red markings indicated what questions Howe asked was speculative.

These are questions of fact. Harmsen testified it is standard for interviewers to place naturalization applicants under oath at the beginning of the interview, that federal regulations require it, and that USCIS trains interviewers to do so. See 8 C.F.R. § 335.2(c). Given the strict requirements in the regulations, Harmsen's testimony she has followed those procedures in thousands of interviews, and the confirming red slashes and handwriting on Deanah's N-400 Application, there was powerful circumstantial evidence that Deanah confirmed under oath at the naturalization interview that she made the false statements.

The district court was free to find the testimony of Harmsen more credible than the contrary opinion of Lichter, who admitted she had never attended a naturalization interview in Des Moines. See Santos, 947 F.3d at 734. In addition, other courts have relied on red ink annotations by immigration officers conducting naturalization interviews. See United States v. Mohammad, 249 F. Supp. 3d 450, 454 n.3 (D.D.C. 2017) (citing cases); Haroon, 874 F.3d at 483. And Deanah points to no case imposing the unrealistic requirement that the interviewing USCIS officer must attend a § 1425(a) trial long after the naturalization interview and testify that he or she complied with the uniform USCIS practice of having naturalization questions

answered under oath.  As in <u>Haroon</u>, 874 F.3d at 483, we conclude that "[a]mple evidence showed that [Deanah] orally ratified [her] written responses" at the interview.[7]

**C. Qualified for Citizenship.**  Finally, Deanah argues she has an independent defense to the § 1425(a) charge because, whatever lies she might have made, she still legitimately qualified for naturalization.  In <u>Maslenjak</u>, the Supreme Court noted that § 1425(a) "is not a tool for denaturalizing people who . . . were actually qualified for the citizenship they obtained."  582 U.S. at 351.  However, because Deanah gave false testimony to obtain an immigration benefit, she lacked the good moral character required to qualify for naturalization.  <u>See</u> 8 U.S.C. §§ 1101(f)(6), 1427(a).

The judgment of the district court is affirmed.

_____

_____

[7]Therefore, we need not decide whether Deanah is correct in arguing that "false testimony" must be given orally to violate 8 U.S.C. § 1015(a).  The argument is based on a statement in <u>Kungys</u>.  In ruling that § 1106(f)(6) does *not* contain a materiality requirement for false testimony, the Court stated:

> "testimony" is limited to oral statements made under oath.  The United States concedes that it does not include other types of misrepresentations or concealments, such as falsified documents or statements not made under oath.

485 U.S. at 780 (cleaned up).  Deanah argues that 18 U.S.C. § 1015(a) independently imposes this same requirement, separate from materiality.  In <u>United States v. Mensah</u>, the First Circuit, citing 28 U.S.C. § 1746 and Federal Rule of Evidence 603, held that § 1015(a) requires a false statement under oath, but the statement does not need to be verbal; "signing a statement under penalty of perjury satisfies the standard for an oath or affirmation."  737 F.3d 789, 806 (1st Cir. 2013) (quotation omitted).  We are inclined to agree.  The government made no contrary concession in this case, as it apparently did in <u>Kungys</u>.

-10-