**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SEVAN AMINTOBIA, AKA Sevan Ameen Charry, AKA Sevan Ameen Jaary, AKA Sevan Ameen Tobia Jaary,

*Defendant-Appellant.*

No. 20-50039

D.C. No. 3:18-cr-03830-JM-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted September 14, 2021
Pasadena, California

Filed January 11, 2023

Before: Ronald M. Gould, Marsha S. Berzon, and Daniel
P. Collins, Circuit Judges.

Opinion by Judge Collins

# SUMMARY[*]

## Criminal Law

The panel affirmed Sevan Ameen Tobia Jaary's conviction for attempting to procure naturalization unlawfully, in violation of 18 U.S.C. § 1425(a), and presenting a naturalization application with false statements, in violation of 18 U.S.C. § 1546(a).

Both convictions were predicated on Jaary's answers to two questions on his naturalization application, in which he asserted that he had never given false information to a U.S. Government official and that he had never lied to such an official to gain an immigration benefit. The Government contended at trial that those answers were false because Jaary had obtained asylum in the U.S. based on a false story that, due to his Chaldean Christian faith, he was threatened in Iraq in May 2008 and attacked and stabbed in Iraq in December 2008. In fact, the Government asserted, Jaary was safely residing in Germany with his brother during the time that he was supposedly being persecuted in Iraq. On appeal, Jaary argued that the Government presented insufficient evidence to establish that any false statements he made during the asylum process were material to his subsequent naturalization application and that his Rule 29 motion for judgment of acquittal on both counts should have been granted.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel first addressed the § 1425(a) conviction. *Maslenjak v. United States*, 137 S. Ct. 1918 (2017), sets forth two alternative ways in which a defendant's false statements would have mattered to an immigration official and would therefore be material to the immigration decision. If the facts the defendant misrepresented are themselves disqualifying from obtaining naturalization, then the defendant's lie is plainly material. But even if the true facts lying behind a false statement would not in and of themselves justify denial of citizenship, they would still be material if they could have led to the discovery of other facts which would do so. Under this alternative "investigation-based theory," the Government must make a two-part showing to meet its burden. First, it must prove that the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials, seeking only evidence concerning citizenship qualifications, to undertake further investigation. Second, the Government must establish the prospect that such an investigation would have borne disqualifying fruit. The Government need only establish that the investigation would predictably have disclosed some legal disqualification. The panel concluded that ample evidence supports the Government's reliance on the "investigation-based theory" of materiality. The panel concluded that, on this record, a rational jury could find, beyond a reasonable doubt, that a reasonable immigration judge apprised of the facts about Jaary's presence in Germany would have found Jaary not to be credible, and would have denied asylum, on the ground that the claimed persecution in 2008 was fabricated and that Jaary thus had not established that he had suffered past persecution. The panel concluded that a rational jury could also find that Jaary

did not actually have a genuine subjective fear of persecution on religious grounds and would therefore have been found ineligible for asylum. Accordingly, the panel concluded that the Government presented sufficient evidence to permit a rational jury to conclude on this basis that Jaary would have been ineligible for asylum and that his false statements on his later naturalization application were therefore material to the naturalization decision under an "investigation-based theory." The panel therefore affirmed the district court's denial of Jaary's Rule 29 motion with respect to the charged violation of § 1425(a).

Noting that Jaary did not contend that the materiality standard for a violation of § 1546(a) is more demanding than for a violation of § 1425(a), the panel concluded that the evidence of materiality was necessarily sufficient as to the § 1546(a) charge, and therefore affirmed the district court's denial of Jaary's Rule 29 motion with respect to that charge.

**COUNSEL**

Vicki M. Buchanan (argued), Sonoma, California, for Defendant-Appellant.

Andrew Y. Chiang (argued) and Valerie H. Chu, Assistant United States Attorneys; Daniel E. Zipp, Assistant United States Attorney, Appellate Section Chief, Criminal Division; Randy S. Grossman, Acting Untied States Attorney; Office of the United States Attorney, San Diego, California; for Plaintiff-Appellee.

## OPINION

COLLINS, Circuit Judge:

Sevan Ameen Tobia Jaary ("Jaary"), an Iraqi citizen, was convicted of attempting to procure naturalization unlawfully, in violation of 18 U.S.C. § 1425(a), and of presenting a naturalization application with false statements, in violation of 18 U.S.C. § 1546(a).  Both convictions were predicated on Jaary's answers to two questions on his naturalization application, in which he asserted that he had never given false information to a U.S. Government official and that he had never lied to such an official to gain an immigration benefit.  The Government contended at trial that those answers were false because Jaary had obtained asylum in the U.S. based on a false story that, due to his Chaldean Christian faith, he was threatened in Iraq in May 2008 and attacked and stabbed in Iraq in December 2008.  In fact, the Government asserted, Jaary was safely residing in Germany with his brother during the time that he was supposedly being persecuted in Iraq.  On appeal, Jaary argues that the Government presented insufficient evidence to establish that any false statements he made during the asylum process were material to his subsequent naturalization application and that his motion for judgment of acquittal on both counts should have been granted.  We reject this contention and affirm his convictions.

### I

### A

Sevan Jaary is a Chaldean Catholic Christian who was born in Baghdad, Iraq in 1990.  His birth certificate lists his father's name as "Ameen Tobia Jaary," and various

documents in the evidentiary record list Jaary's last name as either "Jaary," "Amin Tobia," "Tobia," or "Jary."[1]  Because his U.S. immigration proceedings were conducted under the name "Jaary"; the translation of one of his Iraqi identification documents uses that surname; and his counsel indicated at trial that "Jaary" was his preferred name, we will generally use that name to refer to him on appeal.

By 2001, Jaary's two older brothers, Sinan and Sandi, had left Iraq and were in Germany.  The German government granted Sandi refugee status in approximately 2001, and eight years later, Sandi became a German citizen.[2]  Jaary's sister and parents subsequently came to Germany as well, but they moved to the U.S. in, respectively, about 2004 and 2006.  By 2007, Jaary's sister had become a U.S. citizen, and by around 2009, his parents had become U.S. lawful permanent residents through his sister's sponsorship.  In 2007, Jaary's sister also filed an immigration petition on behalf of Jaary (who was apparently still in Iraq), but as Jaary later explained, "the visa waiting time [was] many years."

In March 2008, Jaary arrived in Germany from Iraq, having entered the country, as German immigration officials put it, "from unknown countries by land."  Upon his arrival, Jaary requested asylum in Germany.  While his asylum application was pending, Jaary was granted temporary

---

[1] By contrast, there do not appear to be any documents in the evidentiary record that use the last name of "Amintobia," which is the name used in the indictment.

[2] After about 14 years in Germany, Sandi married a U.S. citizen, moved to the U.S., and became a lawful permanent resident.

residence by German immigration officials, and he moved in with his brother Sandi in Freiberg.

Jaary appeared at a hearing on his German asylum application on April 23, 2008. As the German Federal Office for Immigration and Refugees ("FOIR") summarized his testimony, Jaary claimed that, in Iraq, he had been "threatened by a masked group he at first did not personally know"; he "was subsequently threatened on multiple occasions by phone"; and the group "sought to extort from him a payment of USD 30,000." The records of the German FOIR do not contain any indication that Jaary ever contended that he had been physically harmed in Iraq.

On August 5, 2008, the German FOIR issued a decision denying Jaary's request for asylum. The FOIR noted that, under the German Asylum Procedure Act, asylum is unavailable to anyone who enters from a "safe third country." Given that Jaary concededly had entered Germany by land, and given that all countries bordering Germany were considered safe third countries, he was necessarily ineligible for asylum.

Nonetheless, in the same decision, the FOIR granted Jaary "refugee" status under the German Residence Act. As the FOIR explained, the relief available under the Residence Act was broader than under the asylum statute in that (1) Jaary's passage through a safe third country did not bar relief under the Residence Act; and (2) the Residence Act provided protection against "persecution by 'non-state actors,'" whereas the asylum statute "requires at least indirect state or quasi-state persecution." Although Jaary had "not produced credible and detailed evidence that he was subjected to individual persecution" in Iraq "due to his belonging to a religious minority," the FOIR concluded that,

in light of the available information concerning country conditions in Iraq, Jaary "would be subject with all probability to persecution" based on his religion if he were returned to Iraq. As the FOIR later described this decision, the granting of refugee status to Jaary was "essentially based on his membership in the faith community of Chaldean Christians." As a result of his refugee status, Germany granted Jaary a "Humanitarian Residence Permit" that allowed him to be employed in Germany without restriction, as well as a travel document that was equivalent to a German passport. These documents were valid for three years, until August 19, 2011, and could apparently be extended for additional periods.

## B

Jaary decided not to stay in Germany, however. In the fall of 2009 he traveled to Mexico, and on November 10, he walked to the port of entry in San Ysidro, California and requested asylum. In accordance with the screening procedures set forth in the expedited removal provisions of § 235(b)(1) of the Immigration and Nationality Act ("INA"), Jaary was interviewed under oath that same day by a U.S. Customs and Border Protection ("CBP") Officer. *See* 8 U.S.C. § 1225(b)(1).

During that interview, which was conducted in the Chaldean language, Jaary said nothing whatsoever about the fact that he and his brothers lived in Germany. Jaary instead claimed that he had just journeyed, with the assistance of smugglers, from Iraq to the U.S., and he said that his two brothers lived in Greece, where they lacked legal residence. Moreover, in seeking asylum in the U.S., Jaary told a very different story from the one that he had told German officials after he applied for asylum there in March 2008. Although

Jaary had actually been in Germany from March 2008 through fall 2009, he told the CPB officer that in early 2008 he was living in his parents' house in Baghdad. He claimed that, due to "the Muslims who constantly threatened the Christians," he was forced to "quit school," and in May 2008 he moved to live with his grandparents in a different section of Baghdad. Jaary told the CBP Officer that he stayed with his grandparents until, on Christmas Day 2008, while he was on his way to church, "Muslim terrorist[s]" "beat [him] up" and "threatened to kill" him. That same day, he said, he fled to Mosul, in northern Iraq, and stayed with his aunt there. But when "[t]he Muslims started executing the Christians there too," he arranged to leave Iraq through the assistance of a smuggler.

The CPB officer asked Jaary about the details of his journey from Iraq to the U.S. Jaary said that, while he was in Mosul, he was "introduced by a relative" to an Iraqi smuggler named "Mukhlis." Jaary claimed that he met Mukhlis three times in Mosul and that Mukhlis ultimately agreed to arrange for Jaary's travel to Spain for $5,500, with a $500 deposit to be paid up front. Jaary stated that thereafter, while carrying a false passport, he "crossed the border" from Iraq into Turkey "by car" with Mukhlis in early 2009 and that the two of them then "walked for two hours." Jaary said that he and Mukhlis eventually made their way to Istanbul, where he stayed for eight months in an apartment owned by Mukhlis that housed several other persons being smuggled. Sometime in early fall 2009, Jaary asserted, Mukhlis introduced him to a Kurdish smuggler named "Ziad." Jaary said that, after Mukhlis supplied him with a new, fake Polish passport, he flew with Ziad on a Turkish commercial airline from Istanbul to Madrid. Jaary stated that they stayed there for about three weeks, and that, while

there, Jaary paid Ziad the $5,000 balance of the smuggling fee.  According to Jaary, he and Ziad then flew from Madrid to Mexico City, where Ziad bought Jaary a bus ticket to Tijuana.  After arriving by bus in Tijuana on November 10, 2009, Jaary walked from the bus stop to the San Ysidro port of entry.  The CBP Officer specifically asked Jaary if he had "travel[ed] to any other countries" besides the ones that he had mentioned, and he responded, "No."  Jaary admitted that he had no entry documents that would allow him to enter the U.S.

The CPB officer concluded the interview by asking Jaary why he had left Iraq and whether he feared returning.  Jaary responded that he had fled Iraq because "[t]he Muslims threatened to kill me if I do not convert to [the] Islamic faith," and he stated that he was afraid to return to Iraq and believed he would be harmed if sent there.  Given Jaary's expressed fear, the CBP Officer referred him for an interview with an asylum officer in accordance with INA § 235(b)(1)(A)(ii).  *See* 8 U.S.C. § 1225(b)(1)(A)(ii) (stating that, if an arriving alien expresses "fear of persecution" during the initial screening interview, "the officer shall refer the alien for an interview by an asylum officer").

On January 27, 2010, while still in custody, Jaary was interviewed by an asylum officer of the U.S. Citizenship and Immigration Services ("USCIS"), using the services of a Chaldean interpreter.  Jaary repeated the same basic claims he had made in his initial interview about being attacked on Christmas Day 2008 in Baghdad and then leaving Iraq in early 2009 for Turkey, Spain, and ultimately the U.S.  In response to the asylum officer's questions, Jaary added additional details about the alleged Christmas Day attack.  Jaary stated that, after finding out that he was a Christian on his way to Christmas church services, four Muslim men hit

and beat him, and one of them stabbed him in the hand. He said that, after going to the hospital, he left that same day for Mosul.[3]

Based on Jaary's responses, the asylum officer made a formal finding that Jaary had a "credible fear of persecution" if he were to be returned to Iraq. Under INA § 235(b)(1)(B)(ii), that meant that Jaary would be allowed to apply for asylum. *See* 8 U.S.C. § 1225(b)(1)(B)(ii) (stating that, "[i]f the [asylum] officer determines at the time of the interview that an alien has a credible fear of persecution . . ., the alien shall be detained for further consideration of the application for asylum"). In finding a credible fear of persecution, the asylum officer specifically determined that "[t]here is a significant possibility that the assertions underlying [Jaary's] claim could be found credible" in an asylum hearing. A supervisory asylum officer, Wole Coker, reviewed and approved this credible-fear determination on January 28, 2010. Shortly thereafter, Jaary was paroled from custody under INA § 212(d)(5). *See* 8 U.S.C. § 1182(d)(5);

---

[3] The asylum officer construed the questions and answers summarized in the written interview notes as claiming that there were *two* similar stabbing attacks, one in May 2008 and one in December 2008. That surmise does not appear to be supported by the actual questions and answers. In response to the asylum officer's specific question about "[w]hat happened in May 2008," Jaary mentioned only threats, which is consistent with the story he told to the CBP Officer. After shifting to a question about Jaary's parents, the asylum officer then asked a *general* question—*i.e.*, one that was not specific as to time—about whether Jaary had experienced harm other than threats, and he then recounted being beaten and stabbed *and going to Mosul*. Given that Jaary never said anything about going to Mosul after the May 2008 incident, but only said that he went to Mosul right after the Christmas Day attack, it seems likely that he was referring only to a single beating and stabbing that he claimed occurred on Christmas Day.

8 C.F.R. § 212.5.

Represented by counsel, Jaary in May 2010 submitted a formal application for asylum that included a declaration from him under penalty of perjury. Jaary's declaration was essentially consistent with what he had told the CPB officer and the asylum officer. With respect to the alleged May 2008 incident, the declaration added the detail that the threats had been in the form of an anonymous letter left outside his parents' front door. As to the claimed December 2008 attack, Jaary's declaration stated that the "knife wound . . . was relatively minor and did not require serious medical attention." The application itself, which was also signed under penalty of perjury, stated that his "two brothers in Greece have applied for asylum but they have not received anything yet." In response to the application's instruction to list all his residences "during the past 5 years," Jaary listed Baghdad, Mosul, and Istanbul, but not Freiberg, Germany. And in the space on the form asking Jaary to identify the country that "issued your last passport or travel document," Jaary listed "Iraq."

An individual hearing on Jaary's asylum application was held before an Immigration Judge ("IJ") on September 3, 2010. Jaary testified under oath at that hearing and swore before the IJ that the contents of his asylum application were "true to the best of [his] knowledge." He again repeated the same essential claims he had previously made concerning the alleged May 2008 and December 2008 incidents. After considering Jaary's testimony and application, the IJ issued an order granting asylum to Jaary. In orally explaining his ruling at the September 3 hearing, the IJ stated that, based on the record, he had "to find Mr. Jaary credible." In an uncannily prescient comment, however, the IJ stated that he had "some suspicion of whether [Jaary] was really in Iraq

during these critical events."  He suspected that Jaary, like "many Iraqis," may "have left earlier," traveled to another country, did not like the "limited" benefits there, and then moved to "see what they can get in another country."  The IJ then stated (emphasis added):

> However, I don't have evidence here to make those conclusions.  Those are just suspicions.  I asked questions, [Jaary] answered my questions basically in a way that I can't really say was not satisfactory.  *So unless the government has evidence that he was residing in any other country, I think I have to grant his [application].*

In March 2012, Jaary applied to become a lawful permanent resident of the U.S.  The application was based on his having been granted asylum in 2010.  In his application, he answered "No" to the question whether he had, "by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the United States, or any immigration benefit."  The application was granted in August 2012.

Meanwhile, the German FOIR realized that it had lost track of Jaary.  His "whereabouts [were] unknown" to the agency "since December 26, 2009," and Jaary failed to seek renewal of his Humanitarian Residence Permit and German passport before they were set to expire in 2011.  Accordingly, the FOIR initiated proceedings to revoke Jaary's refugee status, serving a letter to that effect at his last address in Germany in March 2012.  After Jaary did not respond, the FOIR issued a decision formally revoking his

refugee status, concluding that his behavior "shows that he considers the asylum protection to be unnecessary."

In 2016, Jaary applied to be naturalized as a U.S. citizen. On the 21-page application, Jaary answered "No" to the following two questions:

> Question 31: "Have you ever given any U.S. Government official(s) any information or documentation that was false, fraudulent, or misleading?"

> Question 32: "Have you ever lied to any U.S. Government official to gain entry or admission into the United States or to gain immigration benefits while in the United States?"

Jaary signed the application under penalty of perjury on June 17, 2016. Thereafter, during his personal interview with an immigration officer on March 7, 2017, Jaary swore and certified under penalty of perjury that the contents of his application were correct.

## C

Jaary's application for naturalization was never granted. Instead, in August 2018, Jaary was indicted for (1) attempting to procure naturalization for himself contrary to law, in violation of 18 U.S.C. § 1425(a) (Count 1); and (2) presenting an application for naturalization that "contained material false statements made under oath," in violation of 18 U.S.C. § 1546(a) (Count 2). As framed in the indictment, both charges rested on Jaary's alleged false answers to Questions 31 and 32 on his naturalization

application.[4]

At trial, the Government provided documentary evidence from Jaary's U.S. and German immigration files to establish the core facts concerning Jaary's substantive claims and procedural history in both countries' immigration systems. The Government also called Jaary's brother Sandi as an adverse witness, and he testified that Jaary was in Germany as of March 2008 and that Jaary thereafter never returned to Iraq but instead traveled from Germany to the U.S.

The Government also called several immigration officials as witnesses to explain how Jaary's alleged misstatements could affect the outcome of the various stages of U.S. immigration processes. For example, Wole Coker explained that, if the CBP officer who conducted the initial interview of Jaary had concluded that Jaary did not have a "credible fear" of persecution, an IJ would have reviewed that determination and, if the IJ upheld it, then Jaary would not have been allowed to apply for asylum. Coker specifically stated that, if the asylum officer had known that Jaary was in Germany after March 2008 rather than in Iraq, that would have affected the asylum officer's credibility finding, which in turn would have affected the officer's assessment of the "person's individual experience in the country" in question. Another USCIS supervisory official, Preston Prater, similarly explained that, in the process from credible-fear review to asylum to permanent residence to citizenship, "each step relies on the step before." Prater emphasized that an alien's credibility is important because,

---

[4] The indictment also rested on Jaary's answer to a third question, but the Government did not pursue that theory at trial and it is not before us.

in making credible-fear and asylum determinations, agency personnel "rely strongly on their testimony." Prater agreed that, if the agency learned that the alien had provided "false information about being persecuted in another country," that "could" "justify denying naturalization." As he elaborated, "if they gave false testimony on their asylum application, they probably wouldn't have been approved as an asylee, which allowed them to apply for adjustment of status [as a lawful permanent resident], which would lead—lead up directly to naturalization." On redirect, Prater reiterated that if "the foundation or the ground for the asylum was found to be falsified" that would "be a basis to justify denying naturalization."

Prater also stated, without further elaboration, that if an alien is found to have "lied to obtain immigration benefits," that "would make them ineligible" for naturalization. Prater then answered "Yes" when asked, "If the USCIS found out that the person had lied to the immigration judge in the asylum hearing about suffering persecution in their home country, would that be a reason to justify denying naturalization?" On cross-examination, he clarified that both the lie itself and the information revealed by the lie would be disqualifying: "I would say both. Both the information that we may find out plus—plus a misrepresentation would disqualify them."

Coker also testified that, in making a credible-fear determination, an asylum officer would want to know whether the alien had traveled through other countries or had acquired a legal status there. He stated that "firm resettlement" in a third country before arrival in the U.S. is a "possible bar" to receiving asylum, and he said that, if the asylum officer had known that Jaary had "permission to live and work in Germany," that would have affected the

officer's affirmative determination that Jaary was *not* subject to such a "firm resettlement" bar. At a minimum, an officer who learns that an alien has acquired status in another country would want "to explore why [he or she] can't return to that particular country."

After the close of the Government's case, Jaary moved for judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that there was insufficient evidence to support a conviction, but without identifying any further specific ground for the motion. The district court denied the motion. During closing arguments, Jaary's counsel conceded that Jaary "made a misrepresentation," he "lie[d]," he "left out the part about Germany," and that "he concealed that fact." Jaary argued, however, that the Government had failed to establish that the lies were material to the naturalization decision.

The jury found Jaary guilty on both counts. In its verdict, the jury made a special finding that the responses to Questions 31 and 32 were both false and that the finding of guilt as to each count rested on both responses. The district court sentenced Jaary to six months imprisonment, followed by three years of supervised release. Jaary filed a timely notice of appeal, and we have jurisdiction under 28 U.S.C. § 1291.

## II

We review the district court's denial of Jaary's Rule 29 motion for judgment of acquittal de novo. *United States v. Aubrey*, 800 F.3d 1115, 1124 (9th Cir. 2015). We view the evidence in the light most favorable to the Government and must affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir.

2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (original emphasis in *Jackson*)). "[W]hen 'faced with a record of historical facts that supports conflicting inferences[,]' a reviewing court 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id*. (quoting *Jackson*, 443 U.S. at 326).

## III

Jaary's first count of conviction was for violating 18 U.S.C. § 1425(a). That section makes it a crime to "knowingly procure[] or attempt[] to procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship." 18 U.S.C. § 1425(a). The Supreme Court addressed the requirements of this statute at some length in *Maslenjak v. United States*, 137 S. Ct. 1918 (2017), and we therefore first discuss what *Maslenjak* required the Government to show in this case before addressing the sufficiency of the Government's proof under those standards.

## A

In *Maslenjak*, the Supreme Court construed § 1425(a) in the context of a prosecution for having actually "procure[d]" naturalization "contrary to law," rather than (as here) for an "attempt[] to procure." 18 U.S.C. § 1425(a). The Court held that the requirement that the defendant "procured" the naturalization of a person "contrary to law" means that "the Government must establish that an illegal act by the defendant played some role in [the] acquisition of citizenship." *Maslenjak*, 137 S. Ct. at 1923. The Court further held that, in a case in which the illegal act by which a defendant procured naturalization was "a false statement

made to government officials," the Government must prove, *inter alia*, that the alleged "false statement sufficiently altered" the processes for investigating and adjudicating naturalization applications "as to have influenced an award of citizenship." *Id*. at 1928. *Maslenjak* repeatedly described this element of § 1425(a) as imposing a "causal" requirement that subsumes, but goes beyond, a "materiality" requirement. *See*, *e.g.*, 137 S. Ct. at 1927–30 & n.4 (referring to § 1425(a)'s "causal standard," "causal inquiry," or "causal requirement"); *see also id*. at 1932 (Gorsuch, J., concurring in part and in the judgment) (agreeing that "the statute requires some proof of causation"); *id*. at 1932 (Alito, J., concurring in the judgment) (disagreeing with the majority's adoption of a causation requirement and arguing instead that the statute only imposes a materiality requirement).

Both parties construe *Maslenjak* as establishing, in the context of an *attempted* procurement of naturalization by means of false statements, only a "materiality" requirement. In the attempted procurement context, there is, of course, no actual grant of naturalization that can be said to have been causally influenced by the defendant's false statements, and we therefore agree with the parties that *Maslenjak* cannot be read as applying a "*causal* requirement" in the context of an attempted procurement of naturalization. 137 S. Ct. at 1930 (emphasis added). We assume, without deciding, that the parties are correct in further positing that a defendant charged under § 1425(a) with attempting to unlawfully procure naturalization through false statements cannot be said to have taken the requisite "'substantial step' toward completing the offense" with the intent "to commit the completed offense" unless the defendant's false statements were *material* to the naturalization process in the sense that

*Maslenjak* describes. *United States v. Resendiz-Ponce*, 549 U.S. 102, 106–07 (2007) (explaining that an "attempt" generally requires an intent to commit the offense, coupled with a substantial step). On appeal, Jaary concedes that the Government adequately established that his answers to Questions 31 and 32 of his naturalization application were knowingly false, but he contends that the Government failed to present sufficient evidence to establish the materiality of those answers under *Maslenjak*'s standards.

*Maslenjak* sets forth two alternative ways in which a defendant's false statements "would have mattered to an immigration official" and would therefore be material to the naturalization decision. 137 S. Ct. at 1923. "If the facts the defendant misrepresented are *themselves* disqualifying" from obtaining naturalization—that is, if "the defendant misrepresents facts that the law deems incompatible with citizenship"—then "the defendant's lie" bears an "obvious" relationship to the naturalization inquiry and is plainly material. *Id*. at 1928 (emphasis added). But "even if the true facts lying behind a false statement would not 'in and of themselves justify denial of citizenship,'" they would still be material if they "could have 'led to the discovery of other facts which would' do so." *Id*. at 1929 (citation omitted). Under this alternative "investigation-based theory, the Government must make a two-part showing to meet its burden." *Id*. First, it must "prove that the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials, 'seeking only evidence concerning citizenship qualifications,' to undertake further investigation." *Id*. (citation omitted). Second, the Government must establish "the prospect that such an investigation would have borne disqualifying fruit." *Id*. However, this second prong does

not require the Government to "show definitively that its investigation would have unearthed a disqualifying fact," much less that it present "proof positive that a disqualifying fact would have been found." *Id*. at 1929–30. "Rather, the Government need only establish that the investigation 'would *predictably* have disclosed' some legal disqualification." *Id*. at 1929 (emphasis added) (citation omitted).

If the Government proves materiality under these standards, the defendant nonetheless may assert, as an affirmative defense, that he or she was "actually qualified for the citizenship" he or she sought to obtain. *Id*. at 1930. "Whatever the Government shows with respect to a thwarted investigation, qualification for citizenship is a complete defense to a prosecution brought under § 1425(a)." *Id*.[5]

The inquiry framed by these standards is an objective one. That is, the analysis does not turn on "what any individual decisionmaker" who handled a defendant's application "might have done with accurate information." *Id*. at 1928. Instead, a jury applying these standards "must evaluate how knowledge of the real facts would have affected a reasonable government official properly applying naturalization law." *Id*.

## B

Applying these standards, we conclude that the Government presented sufficient evidence to establish that Jaary's false answers to Questions 31 and 32 were material to his naturalization application.

---

[5] Jaary did not present any such affirmative defense at trial, and we therefore have no occasion to address that issue further here.

**1**

Jaary's responses to those two questions falsely stated that he had never given "any U.S. Government official(s) any information or documentation that was false, fraudulent, or misleading" and that he had never "lied to any U.S. Government official to gain entry or admission into the United States or to gain immigration benefits while in the United States." *See supra* at 14. In fact, Jaary had lied to U.S. immigration officials during his credible-fear interview and on his asylum application by claiming that he had been mistreated in Iraq in May and December 2008 when he was actually safe in Germany. And Jaary had lied on his application for lawful permanent residence when he falsely answered a question that, similar to Question 32 on his naturalization application, asked him whether he had ever willfully misrepresented a material fact to obtain "any immigration benefit." *See supra* at 13.

The Government argues that these facts are sufficient to establish materiality under *Maslenjak*'s first theory of materiality, in which "the facts the defendant misrepresented are themselves disqualifying." 137 S. Ct. at 1928. On this score, the Government asserts that, because Jaary had given "'false testimony for the purpose of obtaining [immigration] benefits,'" he had necessarily "demonstrated bad moral character," which is "itself a reason to deny naturalization." *Maslenjak*, 137 S. Ct. at 1927, 1930–31 (alteration added by *Maslenjak*) (quoting 8 U.S.C. § 1101(f)(6), which provides that an alien's having given such false testimony, without more, establishes a lack of "good moral character" for purposes of the INA); *see also* 8 U.S.C. § 1427(a)(3). Prater, the USCIS supervisor who testified at trial, arguably alluded to this ground when he stated that (1) if "the foundation or the ground for [Jaary's] asylum was found to be falsified"

*that* would "be a basis to justify denying naturalization"; and (2) a "misrepresentation" alone can be disqualifying. *See supra* at 15–16. But Prater did not elaborate as to why a lie itself would be disqualifying, and the Government acknowledges that it "did not elicit testimony at trial about 'good moral character' as a determinative naturalization criterion." Jaary, in turn, claims that false statements during his asylum proceedings in 2009–2010 do not fall within the time frame for assessing moral character for naturalization purposes, which (as applicable here) looks at whether, during the five years preceding Jaary's June 2016 naturalization application, he "is, or was . . . one who has given false testimony for the purpose of obtaining any benefits under [the INA]." 8 U.S.C. § 1101(f)(6); *see also id*. § 1427(a) (specifying relevant time periods for assessing good moral character). This contention, however, arguably overlooks Jaary's false statements on his 2012 application for lawful permanent residence.

We need not resolve these various issues concerning whether the evidence at trial was sufficient to support the Government's theory that Jaary's false statements on his naturalization application were themselves disqualifying, because we conclude that ample evidence supports the Government's reliance on *Maslenjak*'s alternative "investigation-based theory" of materiality. 137 S. Ct. at 1929.

## 2

As we have explained, an investigation-based theory requires the Government to make two showings. The first is that the "misrepresented fact was sufficiently relevant" to a "naturalization criterion that it would have prompted reasonable officials, 'seeking only evidence concerning

citizenship qualifications,' to undertake further investigation.'" *Maslenjak*, 137 S. Ct. at 1929 (citation omitted). On appeal, Jaary has not argued that the Government's proof on this prong was insufficient. Nor could he. Prater specifically testified that, had USCIS known that Jaary had previously given false information to obtain an immigration benefit, the agency would "most certainly" have "investigate[d]" the matter. He explained that part of the naturalization process involves "verify[ing]" that any status an applicant "received prior to applying for naturalization" was "procured legally," and so an investigation would have been undertaken.

Jaary instead contests only the Government's showing on the second prong. That required the Government to show that such an investigation "'would predictably have disclosed' some legal disqualification." *Maslenjak*, 137 S. Ct. at 1929 (citation omitted). On this score, Jaary does not dispute that his false statements in procuring asylum (and, in turn, lawful permanent residence) would have disqualified him from naturalization if, under the true facts, asylum would have been denied at the outset. Instead, in arguing that his false statements were not material, he contends only that, even if he "had been honest, he still would have received asylum."

As a preliminary matter, we agree that, under an appropriate showing, Jaary's false statements in connection with his applications for asylum and for lawful permanent residence could give rise to grounds for denying naturalization. One of the requirements for naturalization is that the person has been "lawfully admitted for permanent residence." *See* 8 U.S.C. § 1427(a)(1); *see also id*. § 1429 (providing that "no person shall be naturalized unless he has been lawfully admitted to the United States for permanent

residence in accordance with all applicable provisions" of the INA).  As defined in the INA, the phrase "'lawfully admitted for permanent residence' means the status of having been *lawfully* accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed."  8 U.S.C. § 1101(a)(20) (emphasis added). Because "'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity," an "alien is not 'lawfully' admitted for permanent resident status if, at the time such status was accorded, he or she was not entitled to it."  *Kyong Ho Shin v. Holder*, 607 F.3d 1213, 1217 (9th Cir. 2010) (simplified) (citations omitted). Because Jaary's sole ground for seeking lawful permanent residence was that he had been granted asylum, *see* 8 U.S.C. § 1159(b) (authorizing issuance of regulations allowing "any alien granted asylum," under certain conditions, to receive a discretionary adjustment of status to that of a lawful permanent resident), it follows that, if he procured his *asylum* status through fraud, he was not "lawfully admitted for permanent residence" and is ineligible for naturalization. *See Kyong Ho Shin*, 607 F.3d at 1217 ("[T]he correct interpretation of the term 'lawfully admitted for permanent residence' is that *an alien is deemed, ab initio, never to have obtained lawful permanent resident status* once his original ineligibility therefor is determined in proceedings." (quoting *Matter of Koloamatangi*, 23 I. & N. Dec. 548, 551 (BIA 2003) (emphasis added)).

Moreover, to be eligible for lawful permanent residence, an "alien granted asylum" must be "admissible," *see* 8 U.S.C. § 1159(b)(5), but an alien is inadmissible if, "by fraud or willfully misrepresenting a material fact," the alien "seeks to procure (or has sought to procure or has procured)

a visa, other documentation, or admission into the United States, or other benefit provided under [the INA]." *Id*. § 1182(a)(6)(C)(i). Accordingly, merely having sought to procure asylum or lawful permanent residence by fraud or willful misrepresentation of a material fact is sufficient to render an alien ineligible for lawful permanent residence and, therefore, for naturalization.

Under these standards, it is clear, at a minimum, that if a reasonable immigration official aware of the true facts would not have granted Jaary asylum, then Jaary was ineligible for naturalization and his false statements on his naturalization application would necessarily be material. We conclude that the Government presented sufficient evidence to make that showing here.

Jaary's only evidence of individual mistreatment in support of his asylum application consisted of two alleged incidents in Iraq in May 2008 and December 2008, but Jaary was already safely in Germany from March 2008 through late 2009. *See supra* at 6–13. Based on that evidence, a rational jury could find that the two claimed incidents in Iraq in 2008 were entirely fabricated and that Jaary had never been personally subjected to any mistreatment on account of his religion at all. Jaary argues that the more "likely" inference that the jury should have drawn is that he simply confused the dates and that the alleged events actually "occurred in 2007 or earlier." But in reviewing the sufficiency of the evidence, we may not weigh the competing inferences ourselves, but must draw all reasonable inferences in favor of the verdict. *See Nevils*, 598 F.3d at 1163–64. Even if the jury might reasonably have drawn a different inference, it was entitled to conclude that Jaary simply made up his claims of persecution and that in fact he had never been subjected to mistreatment on account

of his religion. Indeed, the fact that Jaary's claims of persecution in his U.S. asylum proceedings were much more serious than the very different story he told to German immigration officials further underscores that a reasonable jury could have found his claims to be wholly false.

For the same reason, based on the trial evidence, a rational jury readily could have found that a reasonable asylum officer and a reasonable IJ would have concluded that Jaary's statements and testimony about experiencing persecution were not credible. *See Maslenjak*, 137 S. Ct. at 1928. Prater testified that an alien's giving "false testimony on their asylum application," or lying to the IJ during the asylum hearing would likely lead to a denial of asylum. *See supra* at 16. Moreover, the IJ openly expressed suspicions that Jaary was not actually in Iraq during the time he claimed to have been persecuted, but the IJ said that, in the absence of evidence to support those suspicions about Jaary's credibility, he thought that he "ha[d] to grant" Jaary's asylum application. We conclude that, on this record, a rational jury could find, beyond a reasonable doubt, that a reasonable IJ apprised of the facts about Jaary's presence in Germany would have found Jaary not to be credible, and would have denied asylum, on the ground that the claimed persecution in 2008 was fabricated and that Jaary thus had not established that he had suffered past persecution.

To be sure, even without evidence of past persecution, Jaary still could have been found eligible for asylum if he could have "establish[ed] a well-founded fear of future persecution by showing both a subjective fear of future persecution, as well as an objectively 'reasonable possibility' of persecution upon return to the country in question." *Duran-Rodriguez v. Barr*, 918 F.3d 1025, 1029 (9th Cir. 2019) (citation omitted). As we have explained, an

asylum applicant can "satisf[y] the subjective component by credibly testifying that she genuinely fears persecution." *Mgoian v. INS*, 184 F.3d 1029, 1035 (9th Cir. 1999).  We have also recognized that even where an applicant's own testimony about past persecution is found not to be credible, "strong" country conditions evidence that establishes the objective component of a well-founded fear of persecution claim can be "relevant in establishing [an applicant's] subjective fear," because "[m]ost people are sensible enough to harbor a genuine fear of persecution if the actual likelihood of persecution is high." *Al-Harbi v. INS*, 242 F.3d 882, 890 (9th Cir. 2001).

Jaary argues that the evidence concerning conditions facing Chaldean Christians in Iraq that was submitted in support of his asylum application precluded a rational jury from finding that he lacked a subjective fear of persecution based on his religion.  Jaary made a similar argument to the jury, but in our view the jury was entitled to reject it.  This evidence consisted of summaries of various reports that were published between 2004–2010 concerning the treatment of Christians in Iraq.  These reports paint an unsettling picture of extremist violence against Christians and Shia Muslims in Iraq, but some of the reports also state that matters had improved between 2006–2009.  For example, one State Department report from 2009 stated that there had been "improvement in the general security situation" and that extremists' "influence and ability to attack ha[d] significantly weakened since 2007."  Perhaps these reports could have led the jury to draw the inference that Jaary suggests, but that is not the standard of review that we must apply.  Rather, we are required to "determine whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt.'" *Nevils*, 598 F.3d at 1163–64 (quoting *Jackson*, 443 U.S. at 319 (original emphasis in *Jackson*)). Given the countervailing evidence in the record concerning Jaary's own experiences, including that he never recounted any such persecution to German authorities, his lack of credibility because of his lies about past persecution, and the evidence suggesting improving conditions in Iraq, a rational jury could find that he did not actually have a genuine subjective fear of persecution on religious grounds and would therefore have been found ineligible for asylum.

Jaary also points to the German FOIR's grant of refugee status to him, *see supra* at 6–8, but this evidence did not *require* the jury to conclude that a reasonable asylum officer and a reasonable IJ would have found that he had a subjective fear of persecution based on religion. The FOIR, based on the record before it, concluded that it was "to be assumed" that Jaary would face persecution "if he were to return to Iraq at the present time." But whatever country conditions evidence the FOIR reviewed was not before the jury and the jury was not bound by the FOIR's conclusion. Also, the FOIR did not have the subsequent additional information that, when pressed to identify any actual incidents of such persecution, the best that Jaary could do was to concoct two incidents that never happened.

Accordingly, we conclude that the Government presented sufficient evidence to permit a rational jury to conclude on this basis that Jaary would have been ineligible for asylum and that his false statements on his later naturalization application were therefore material to the naturalization decision under an "investigation-based theory." *Maslenjak*, 137 S. Ct. at 1929. Consequently, we have no occasion to address Jaary's contention that the

Government failed to produce sufficient evidence to support its alternative theory that Jaary had firmly resettled in Germany and would have been ineligible for asylum on that additional basis.  We therefore affirm the district court's denial of Jaary's Rule 29 motion with respect to the charged violation of § 1425(a).

**IV**

Jaary's second count of conviction was for a violation of 18 U.S.C. § 1546(a).  That section makes it an offense, *inter alia*, to "knowingly make[] under oath . . . any false statement with respect to a *material* fact in any application, affidavit, or other document required by the immigration laws or regulations" or to "knowingly present[] any such application, affidavit, or other document which contains any such false statement."    18 U.S.C. § 1546(a) (emphasis added).    We have described § 1546(a)'s materiality requirement as requiring only proof that the statement in question was "*capable* of affecting or influencing a governmental decision," and we have further held that "[t]he false statement need not have *actually* influenced the agency, and the agency need not rely on the information in fact for it to be material."  *United States v. Matsumaru*, 244 F.3d 1092, 1101 (9th Cir. 2001) (emphasis added) (citation omitted).  The jury instructions given in this case—which neither side has contested on appeal—were consistent with this definition.  We are thus not presented with, and do not decide, whether our prior articulation of the materiality standard of § 1546(a) must be re-examined in light of *Maslenjak*'s analysis of the requirements of § 1425(a).  In all events, Jaary does not contend that the materiality standard for a violation of § 1546(a) is *more* demanding than for a violation of § 1425(a).  Because we have concluded that the evidence of materiality was sufficient as to the § 1425(a)

charge against Jaary, it follows that the evidence was necessarily sufficient as to the § 1546(a) charge as well. We therefore also affirm the district court's denial of Jaary's Rule 29 motion with respect to that charge.

**AFFIRMED.**